UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL TATER-ALEXANDER,<br><br>　　　　Plaintiff,<br><br>v.<br><br>LONNIE R. AMERJAN, CITY OF CLOVIS, TINA STIRLING, COMMUNITY REGIONAL MEDICAL CENTER, DR. THOMAS E. MANSFIELD, MARY JO GREENE, and DOES 1 through 100.<br><br>　　　　Defendants. | 1:08-cv-00372 OWW SMS<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW<br><br>Complaint Filed: March 14, 2008<br>Trial: May 3 – 11, 2011<br>Courtroom: 3<br>Judge: Hon. Oliver W. Wanger |

## I.   INTRODUCTION

Plaintiff Michael Tater-Alexander ("Plaintiff") proceeds with this action against Defendant Fresno Community Hospital and Medical Center, dba Community Regional Medical Center ("Defendant") and operator of Clovis Community Medical Center for alleged violation of the Americans with Disabilities Act ("ADA"), California Disabled Persons Act ("DPA") and Unruh Civil Rights Act. The case was tried before an advisory jury over six days from May 3 to 11, 2011. Nine witnesses were called: (1) David M. Arguito; (2) Mary Lee Contreras, R.N.; (3) Michael Tater-Alexander; (4) Marilyn Jo Greene, R.N.; (5) Kathryn Kawaguchi, R.N.; (6) Corporal Lonnie Amerjan; (7) Thomas Mansfield, M.D.; (8) Charles William Mitchell; and (9) Niel

Bianco. After hearing the evidence and arguments of counsel and being duly instructed by the court, the jury signed and returned the verdict after answering "No" to the first question:

> At the time of this occurrence, was plaintiff disabled as that term is defined by the Americans with Disabilities Act?

Doc. 335.

## II.  FINDINGS OF FACT

### A.  The Incident

1.   Shortly before 7:00 p.m. on Saturday, March 17, 2007, Plaintiff drove himself to Clovis Community Medical Center. Plaintiff registered for treatment in the Emergency Department for a complaint of abdominal pain at approximately 18:48 (6:48 p.m.).

2.   Clovis Community Medical Center was at all relevant times a hospital operated by Defendant. Defendant concedes that it operates a place of public accommodation under the ADA.

3.   Clovis Community Medical Center's Emergency Department was busy the night of March 17, 2007.

4.   According to the medical record, the triage nurse saw Plaintiff at 7:02 p.m. The triage nurse noted that Plaintiff's pain level was 9 on a scale of 1 to 10, with 10 being the highest/severe pain. The triage nurse noted Plaintiff's past medical history as: ""Pancreatitis. Peptic ulcer disease. Back problems. Three beers over past two weeks."

5.   Marilyn Jo Greene, R.N., the supervisory nurse in the Emergency Department that evening, noted at 7:10 p.m. that Plaintiff was ambulating without help.

6.   Plaintiff testified that he had to sit and wait for a couple of hours between the time he saw the triage nurse and the time he was taken to a room. The medical record and the testimony of Nurse Greene show that triage occurred at 7:02 p.m. and Plaintiff ambulated to a room in the Emergency Department at 7:29 p.m., twenty-seven minutes after triage.

7.   There were two blankets in the Emergency Department exam room. Plaintiff covered himself with one blanket and put another blanket over his feet. Plaintiff was wearing thermals, sweats, a T-shirt, and hoodie.

8.   At 7:40 p.m., Nurse Greene noted in Plaintiff's chart that Plaintiff refused to change into a hospital gown, refused physical assessment, and was educated on the hospital's need to be able to complete a physical exam of Plaintiff, who continued to refuse.

9.   Defendant had an unwritten practice of having patients in the Emergency Department wear a gown to facilitate examination and treatment.

10.  At 9:15 p.m. Nurse Greene noted in the chart that Plaintiff "[c]ontinues to refuse to cooperate with this nurse.

Stated: 'I don't want to be here any more than you want me here so just give me what I want and I will leave.'"

11.  Thomas Mansfield, M.D., an emergency physician, made his first notes in Plaintiff's chart at 9:55 p.m.

12.  Dr. Mansfield was an independent contractor and not an employee or agent of Defendant or Clovis Community Medical Center.

13.  Plaintiff was loud and profane. Security was called at approximately 10:14 p.m. Security Officer Charles Mitchell, an employee of the hospital, arrived at approximately 10:21 p.m.

14.  At 10:24 p.m., Dr. Mansfield noted: "Security with patient. Refuses to comply with removing T-shirt for IV and CT scan. Wants police called. Police and supervisor talked at length with patient and finally agreed to take shirt off for IV and CT. Patient continued antics. Refused to take PO contrast. The oral contrast for the CT scan. Then wouldn't lie down for the CT."

15.  At 10:25 p.m. Nurse Greene noted in Plaintiff's chart: "Dr. Mansfield at bedside. Patient refusing to cooperate with M.D. for physical assessment. "

16.  Security Officer Mitchell attempted to get Plaintiff to calm down, cooperate, and put on a hospital gown.

17.  Plaintiff told Security Officer Mitchell that he was not putting on "a fucking dress."

18. The Clovis Police were called. Officer Tina Stirling of the Clovis Police Department arrived at approximately 10:30 p.m. A few minutes after Officer Stirling's arrival, Corporal Lonnie Amerjan of the Clovis Police Department arrived.

19. Corporal Amerjan spoke with Dr. Mansfield, who requested Corporal Amerjan's assistance with Plaintiff.

20. Corporal Amerjan attempted to obtain Plaintiff's cooperation. Plaintiff told Corporal Amerjan that he did not want to be treated by Dr. Mansfield or Nurse Greene. Corporal Amerjan asked Plaintiff why he would not put on a gown and Plaintiff responded that the doctor could see him as he was. Plaintiff requested a patient advocate.

21. Kathryn Kawaguchi, R.N., the House Supervisor, came to the Emergency Department, spoke with Plaintiff, and got him to cooperate, put on a gown over his clothing, and allow her to put in an IV.

22. Plaintiff took the hospital gown off and put his jacket back on as soon as the nurse left.

23. Plaintiff calmed down and discontinued his disruptive conduct. Security Officer Mitchell and the two Clovis Police Officers left around 11:35 p.m.

24. At 4:00 a.m. on March 18, 2007, Plaintiff was given Ativan, a relaxation agent that decreases pain by decreasing spasm.

25. The nurse's notes indicate that at 4:20 a.m. Plaintiff could not keep down the oral contrast for the CT scan.

26. At 4:40 a.m. Nurse Greene noted that Plaintiff was refusing to cooperate with the CT technician and the House Supervisor was present to talk with Plaintiff.

27. At 5:45 a.m. Dr. Mansfield ordered Dilaudid, a pain medication, for Plaintiff.

28. At 5:50 a.m., Plaintiff returned from the CT scan and was resting quietly.

B.   Plaintiff's Condition

29. Plaintiff alleges that he has an environmental sensitivity to cold that aggravates longstanding shoulder and back pain. Plaintiff claims that he refused to put on a hospital gown because he would be cold if he wore a gown, which would increase his shoulder and back pain.

30. Plaintiff testified that he told Nurse Greene that being cold aggravates his disability and causes him pain.

31. Nurse Greene testified that Plaintiff did not tell her that he was sensitive to the cold. Nurse Greene testified that if Plaintiff had told her he did not want to wear a hospital gown because he has an environmental sensitivity to cold which aggravates the pain in his shoulders and spine, then she would have offered him warm blankets.

32.  No witness testified that they heard Plaintiff say on the night of March 17, 2007 that he had sensitivity to cold, or any disability, which needed to be accommodating by permitting Plaintiff to not wear a hospital gown.

33.  Plaintiff introduced a copy of a 1994 decision of an Administrative Law Judge for the Office of Hearings and Appeals, Social Security Administration. The document, which is non-authenticated hearsay and more than sixteen years old, was admitted for the limited purpose of showing notice to Clovis Community Medical Center and on the issue of whether Clovis Community Medical Center used any reference from the record to diagnose or treat Plaintiff. The document was in Clovis Community Medical Center's medical file on Plaintiff from an earlier visit. Sensitivity to cold is not mentioned anywhere in the decision.

34.  No medical or other evidence was introduced that Plaintiff had a sensitivity to cold which aggravated pain in his shoulders and back except the testimony of Plaintiff.

35.  Plaintiff testified that he wore a gown at Clovis Community Medical Center when he was there for treatment in August 2005.

36.  No medical expert was offered to provide testimony to support that Plaintiff had any disability, including a cold sensitivity.

37.   Plaintiff testified to his current use of medications, but no doctor who prescribed any of those medications was named or testified. No other evidence of Plaintiff's use or of need for medication was offered.

38.   Plaintiff testified to the following limitations and need for assistive devices:

   a.   Plaintiff has had extreme pain in his shoulders, lower back, and left leg, all the time since an automobile accident in April 1987.

   b.   Plaintiff has used a cane for approximately twenty years. Plaintiff has used two canes, when necessary, for the last ten years.

   c.   Plaintiff has used a walker for the last five to seven years, when necessary.

   d.   Plaintiff has used a wheelchair for the last seven to eight years. Plaintiff has used an electric wheelchair since August 2009.

   e.   Plaintiff needs a cane to assist in walking due to pain in his lower back where the disc is located. Plaintiff's disc moves and pinches on an area and usually affects the left leg all the way down to the toe, causing numbness and tingling. It gets to where Plaintiff's leg feels numb from the calf down and he falls.

   f. Plaintiff does not use a cane all the time, e.g., around the house where there is thick carpeting and the walls are close enough so Plaintiff can keep himself balanced. Plaintiff uses a cane when he goes out in public, on concrete, hard surfaces, and asphalt.

   g. On a good day Plaintiff could probably walk a few blocks without an assistive device, but that would take hours and would be incredibly painful. Plaintiff would have to stop, lean against something, and sit down. Plaintiff uses canes to distribute most of his weight.

   h. Plaintiff's shoulder issues have "absolutely" been consistent from 1987 to the present. Plaintiff testified: "I can't open the refrigerator without pain. I can't pour a gallon of milk without putting my arm, elbow against my body and turning. It's difficult to push and pull anything."  "Just the magnet trim around double door refrigerator, I have to use my weight and usually two hands or the other hand to push off of the freezer door to get the door open."

   i. When going outside Plaintiff must ensure he dresses according to the weather. "If it's raining, damp, barometric pressure rises, it hurts, everything hurts. It affected my joints, my bones. Even if it's just cold, below 70 degrees, everything starts hurting."

    j. During football season, Plaintiff shoots videos of high school football games. The games are usually in September or October, there is not a lot of wind, and the weather is in the 70's, 80's, or even 90's. Plaintiff tries to get in the press box or an area that is shielded from the wind.

    k. Plaintiff's strength in gripping and pushing and pulling has not improved since the Social Security Decision. Plaintiff stated that he can lift only seven to eight pounds and has trouble gripping objects.

    l. In December, January and February Plaintiff's body is at its worst shape. "Sort of a bear in half hibernation, yeah, spend pretty much the majority of my day in bed."

  39. Plaintiff's testimony as to his physical limitations and Plaintiff's credibility were materially impeached by a video of Plaintiff taken on January 17, 2010 by Niel Bianco, an investigator, and entered as Exhibit 214 ("Video").

  40. The severe limitations on Plaintiff referenced in No. 38, above, and the severe limitations on Plaintiff's movement in court, are in stark contrast to Plaintiff's ability to walk without any assistive device, get on and off a motorcycle, move a gate, and ride the motorcycle in damp weather with temperature in the mid 50's depicted in the Video.

  41. Plaintiff did not retake the witness stand after the Video was shown to explain the material inconsistency between

his physical abilities and limitations as shown in the Video, and those he demonstrated in court and described in his testimony.

42.   Plaintiff frequently went beyond what was necessary to answer questions put to him to argue his position, demonstrating bias. For example, when asked whether he made a demand for a substantial amount of money he answered, "Absolutely.  For punishment. Absolutely. Saying I'm sorry isn't going to change it. That's why we're here." Plaintiff was also asked whether he raised his voice at the hospital. His response: "Not any more so then we're talking right now. In fact, the only loud voices were once the police were called and they were in and out of the hallway and in and out of the room and they brought in security. They're the ones creating the disturbance. I was laying in the bed curled up in a ball in pain from hell. Not getting treatment. As punishment for not putting on a gown. For 14 hours."

43.   Plaintiff's demeanor on cross-examination was hostile toward Defendant.

44.   The court finds that Plaintiff was not a believable witness, based on attitude, demeanor, frequency and extent of impeachment, interest in outcome of the case, and bias against Defendant.

45.  Plaintiff testified that after his Social Security decision in 1994 he "saw them like five years after the initial one. And then they told me we probably won't see you again until 2010, which was like ten years." He said he got a notice from them in November of last year, but thinks the appointment they scheduled conflicted with a doctor's appointment so it was rescheduled to sometime in January or February of this year. Whether Plaintiff had a recent evaluation by someone associated with the Social Security Administration is unclear. No one associated with an examination for the Social Security Administration testified.

46.  Plaintiff testified to his current use of medications, but no doctor who prescribed any of those medications was named or testified.

47.  The advisory jury was properly instructed, heard the evidence, and rendered a unanimous verdict that Plaintiff was not disabled as defined by the ADA.

48.  The court, having heard the same evidence as the jury, respects the jury's decision and independently concludes that the Plaintiff has not carried his burden to prove that he was disabled as that term is defined by the ADA.

### III. CONCLUSIONS OF LAW.

1.  Title III of the ADA prohibits discrimination in public accommodations. It provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

2.  Discrimination under the ADA includes:

> failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii). It is also discriminatory "to subject an individual or class of individuals on the basis of a disability or disabilities . . . to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i).

3.  An individual alleging discrimination under the ADA must show:

> (1) he is disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) the defendant employed a discriminatory policy or practice; and (4) the defendant discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiff's disability.

*Fortyune v. Amer. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th

Cir. 2004).

4. The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "Physical or mental impairment" means:

> (A) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine;
> (B) Any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

28 C.F.R. § 35.104. Physical and mental impairments include:

> such contagious and noncontagious diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, HIV disease (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.

Id. "Major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id.

5. The definition of disability is "construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A). The ADA, however, "defines 'disability' with

- 14 -

1  specificity as a term of art. Hence, a person may be 'disabled'
2  in the ordinary usage sense, or even for purposes of receiving
3  disability benefits from the government, yet still not be
4  'disabled' under the ADA. The converse may sometimes be true as
5  well." *Sanders v. Arneson Prod., Inc.*, 91 F.3d 1351, 1354 n.2
6  (9th Cir. 1996); *see also Thornton v. Fed. Express Corp.*, 530
7  F.3d 451, 455 (6th Cir. 2008) (holding that a disability
8  
9  determination by the Social Security Administration, even if
10  substantiated, would not be controlling to prove that an
11  individual is disabled within the meaning of the ADA).
12  
13      6.   The Unruh Civil Rights Act provides:

> All persons within the jurisdiction of this state are free
> and equal, and no matter what their sex, race, color,
> religion, ancestry, national origin, disability, medical
> condition, marital status, or sexual orientation are
> entitled to the full and equal accommodations, advantages,
> facilities, privileges, or services in all business
> establishments of every kind whatsoever.

Cal. Civ. Code § 51(b). A violation of the ADA constitutes a
violation of the Unruh Civil Rights Act. Cal. Civ. Code § 51(f).

     7.   The DPA guarantees that "[i]ndividuals with
disabilities shall be entitled to full and equal access, as
other members of the general public, to accommodations,
advantages, facilities, medical facilities, including hospitals,
clinics, and physicians' offices." Cal. Civ. Code § 54.1(a)(1).
"Full and equal access" means access that meets the standards of

the ADA. Cal. Civ. Code § 54.1(a)(3). A violation of the ADA constitutes a violation of the DPA. Cal. Civ. Code § 54.1(d).

  8.  Plaintiff concedes that to find a violation of the Unruh Civil Rights Act or the DPA he must establish an ADA violation.

  9.  The advisory jury was properly instructed, heard the evidence, and rendered a unanimous verdict that Plaintiff was not disabled within the meaning of the ADA.

  10. Plaintiff has not carried his burden to prove that he was disabled within the meaning of the ADA.

  11. Plaintiff presented no medical testimony or other expert evidence of his physical and mental condition.

  12. Plaintiff's description of his alleged physical and mental impairments was contradicted by the Video. As trier of fact, the jury made the decision that Plaintiff did not suffer from a disability. There is no basis to find to the contrary.

  13. Defendant and its employees did not discriminate against Plaintiff by reason of a disability within the meaning of the ADA.

  14. Defendant is not responsible for the conduct of Thomas Mansfield, M.D., who was an independent contractor and not an agent or an employee of Clovis Community Medical Center or Defendant.

15.  Defendant did not violate the ADA, DPA, or Unruh Civil Rights Act.

16.  Defendant is not liable to Plaintiff and is entitled to judgment in its favor.

17.  Defendant may submit a cost bill in accordance with the requirements of law.

18.  The court has fully considered the voluminous proposed findings and conclusions submitted by both parties and their respective objections. To the extent any finding of fact can be interpreted as a conclusion of law or the converse, it is so intended.

### III. ORDER

For the reasons stated, it is ORDERED that:

1. Defendant is not liable to Plaintiff and Defendant is entitled to judgment against Plaintiff on all claims.
2. Defendant may submit a cost bill in accordance with the requirements of law.
3. Defendant shall submit a form of judgment consistent with this Order within five (5) days following service of these findings.

SO ORDERED.

DATED: August 12, 2011.

                    /s/ Oliver W. Wanger
                    Oliver W. Wanger
                United States District Judge